**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
Johnstown Division

UNITED STATES OF AMERICA ex rel.
MIKE KANE,

                Plaintiff/Relator,

           v.

BEEGHLY TREE, LLC, HILLVALE
ENTERPRISES, LLC, PROGRO
ENVIRONMENTAL, LLC, HILLVALE
FARMS, RYAN BEEGHLY, MATT
BEEGHLY, and HEATH YOUNKIN,

                Defendants.

CIVIL DIVISION

No. 21-cv-160

Hon. Kim R. Gibson

**DEFENDANTS' OBJECTION AND RESPONSE IN OPPOSITION TO
RELATOR'S MOTION FOR AN AWARD OF ATTORNEYS FEES AND EXPENSES**

AND NOW COME Defendants, by and through their undersigned counsel, and in support of the within Objection and Response in Opposition to Relator's Motion for an Award of Attorney Fees and Expenses states as follows:

## **INTRODUCTION**

Relator Mike Kane ("Relator") was the controller for Defendant Hillvale Enterprises ("HVE") from 2018 until he was fired in July 2020. He hired a law firm in Washington, D.C. shortly thereafter to level claims of fraud and other alleged misdeeds regarding the Defendants' use of funds under the Paycheck Protection Program ("PPP") 15 U.S.C. § 636(a)(36).

Due to his controller position and information access, Kane should have had an accurate, factual mastery of the claims that he leveled at Defendants. More specifically, he should have been able to support those claims <u>before</u> he sold his lawyers a story that ultimately ended years later with a whimper under just a modicum of scrutiny.

Mike Kane was relied upon by HVE to do his job during his tenure. Instead, he overdrew bank accounts, failed to renew Commonwealth certifications that cost Defendants hundreds of thousands of dollars, and he ultimately needed to be replaced. Instead of taking responsibility for his own failures, Kane sought revenge through lawyers and claims to the government. In the process, he made Defendants and the United States Government, e.g., the taxpayers, spend untold amounts to flesh out his fictional account to get even with his former employer. And now, this Honorable Court and Defendants are forced to sift through what appears to be a frenzy of hourly billing, on a contingent matter, to determine what is "reasonable."

Relator seeks more than $116,000 in attorney fees for a claim that resulted in a $200,000 payment to the government as part of a settlement. Relator received a share of the settlement proceeds pursuant to 31 U.S.C. § 3730(d) in the amount of $32,000. The restitution amount was merely $94,000. Relator wants a contingency of 60 percent.

As this Honorable Court will see, Relator's fees should be significantly reduced because: (1) Relator's demand is excessive and he seeks recovery of fees that are unreasonable (e.g., multiple attorneys billing at the same time for the same thing, charging to find their own client when he was apparently nonresponsive, charging to schedule internal meetings); (2) the fees relate to work that was obviously wasteful and useless; (3) the underlying merit of the claims conjured up after spending $116,000[1] in attorney fees ultimately were rejected except one administrative foul; and (4) the hourly rates charged are nearly double what is reasonable for this region.

---

[1] It is Defendants' understanding that the attorney fee demand as of May 2024 was approximately $78,000. It is unclear why Relator is demanding nearly $30,000 more in a matter of months when the principal settlement amount was already agreed to.

Relator's petition fails to establish that the work was reasonable and necessary. The Petition is conclusory at best and ignores how obviously misguided nature of Relator's claims. Indeed, Relator was a controller with allegedly intimate knowledge of the Corporate Defendants' inner workings, he retained documents from his employment, and he claims an understanding of the underlying facts. For all this Court and Defendants know, Relator provided his counsel with a complete package and roadmap, thus rendering a substantial amount of the "charged" fees unnecessary[2]. Instead, the petition merely adds up attorney fees over years by nine separate time keepers, lumps them together, and seeks to shift this burden to Respondents and the Court to figure it out. Ultimately, the petition in support of those excessive fees contains no basis to conclude that the hourly rates or time spent was reasonable, other than affidavits submitted by the attorneys who worked on this case and one generic affidavit by Attorney Morgan [ECF No. 36-5] that stated attorney Stone's rate of $825 per hour is reasonable in this district[3].

What's worse, Relator's claim was of such limited veracity that after more than two years of wasting Defendants' and the taxpayer's resources that the United States Attorney found merit in only a sliver of Relator's claims—and those claims were based solely on an administrative issue. This fact should be vital to the Court's decision. It simply demonstrates that the majority (if not all) the fees sought in this case were spent chasing baseless claims. Said otherwise, Relator now wants to shift his own wasteful, misguided efforts onto Defendants who already have made a payment to the government and endured their own legal expenses in defense. Even

---

2 If necessary, Relator should be required to produce the documents it originally provided to counsel to determine how much actual work was done, for just one example of the documents required to determining the reasonableness of fees.
3 By comparison, the undersigned is based in Pittsburgh, has an hourly rate of $550 per hour, has been practicing for 24 years, and is Vice Chair of Litigation and Co-Chair of the Construction Group at a 140 person law firm.

worse, the taxpayers have already paid a premium on a wild goose chase caused by Relator's accusations that fell flat upon scrutiny. In the end, only the Relator's lawyers stand to profit.

The level of misdirection from Relator is stunning. Relator went so far as to make claims in the complaint for acts that occurred <u>after</u> he was terminated, which makes him arguably ineligible to bring a *qui tam* claim on those issues because he is not the original source. In the hundreds of hours and more than $116K in fees Relator is demanding, this basic fact was missed—for just one example. Defendants should not have to pay for it.

As this Honorable Court will see, Relator is attempting to recover attorney fees for things such as waiting on hold for calls that did not occur, health and wellness checks on Relator when he apparently did not respond to counsel, downloading and installing Microsoft Teams, and transitioning the case to other attorneys to accommodate leaves of absence, just to name a few.

Based upon the minimal merit of the underlying claims, the result obtained, and the level of wasteful billing, Defendants request that this Honorable Court apply a proportionality standard or some other mechanism that is fair.

Finally, Defendants offer the Declaration of seasoned commercial litigator, Gary Hunt, Esq. as an alternative to the fee calculation sought by Relator.

## CASE BACKGROUND

Relator was the controller for Beeghly Tree in 2018 until he was transferred to Hillvale Enterprises ("HVE") in 2019. HVE terminated Relator in July 2020.

In the spring of 2020, the Corporate Defendants applied for and were granted loans under the Paycheck Protection Program ("Draw 1"). In February 2021, approximately seven months after Relator was fired, the Corporate Defendants applied for a second PPP loan, which was

approved ("Draw 2"). The Corporate defendants also applied for PPP loan forgiveness, for which they were approved.

Relator filed a 152-paragraph complaint under seal on September 13, 2021 [ECF No. 1]. Relator alleged five counts. One through four related to False Claims Act violations and the fifth count related to employment retaliation under Section 3703(h)[4]. Relator's claims ran the gamut from mis-categorizing lease payments to misuse of PPP funds to deploy the Corporate Defendants' employees to the personal residence of an owner, illegally using prepaid gift cards to perpetrate a fraud, misallocating rent payments, and applying PPP funds for unauthorized expenses. [ECF 2, ¶¶ 98-105]. Relator apparently sold his counsel on these facts, likely claiming superior knowledge as the controller.

The Complaint also makes a number of allegations related to a second draw loans, which were applied for on or about February 24, 2021. One of the hallmarks of a "whistleblower" is that they must be an "original source." 31 U.S.C. § 3730(B).  Notably, Kane was fired in or about July 2020 [ECF No. 2, ¶ 113], and therefore, he cannot be the "original source."

A year later, the United States Attorney issued subpoenas on the Corporate Defendants, to which the Defendants responded on or about September 28, 2022.

The United States Attorney also deposed designee Ryan Beeghly on August 17, 2023 (for which he appeared without notice or subpoena), subsequent to which the United States Attorney began settlement discussions with the Defendants. Neither Relator nor counsel were present at the deposition. Also, at least one employee of Defendants was interviewed and Defendants' banks received subpoenas to produce documents. This was an extensive exercise borne by the

---

4 The retaliation claim was settled separately and therefore no fees related to that claim should be included in this petition.

United States Attorney's office and paid for by taxpayers. All the while, the Defendants fully complied and acted in good faith with the United States Attorney's Office.

On September 18, 2023, the United States Attorney sent a correspondence extending a settlement offer of $638,004 and stating an intention to partially intervene on Relator's claims. A true and correct copy of this correspondence is attached hereto as Exhibit A. The United States Attorney, after two years of its own investigation and the aforementioned discovery, believed it could proceed on four distinct issues related to ignoring the PPP cap on excess owner payments, using PPP funds for ineligible expenses, employing in excess of 300 employees for the second-draw PPP loans, and "falsely certifying" compliance with the requirements in the PPP loan applications and forgiveness applications. The government, via Relator, claimed there was an excess payment made to Defendants in the amount of $319,002. See, Exhibit A, Damages Worksheet.

Defendants, through negotiation with the United States Attorney's Office, made an in-person presentation to explain why many of the allegations by Relator were simply false and misguided. The government responded on November 28, 2023 and reduced the demand to $382, 802.

The government noted the following:

> Thank you, again, for your presentation on November 13, 2023. The United States appreciates Defendants' willingness to meet, their candor, and their good faith settlement offer. The United States acknowledges that Defendants have potentially viable defenses to the "Employee Count" allegations raised in the *qui tam* Complaint, and that the "employee census" included on Slides 3 and 4 of your presentation appears to be accurate.[2] The United States further understands that Defendants question Relator's credibility and would likely attempt to file counterclaims against Relator if this case does not settle. And, the United States continues to recognize that Defendants appear to have used the majority of their Paycheck Protection Program ("PPP") funds for legitimate purposes, and that they provide value to the community.

Admittedly, the government did not fully accept the Defendants' position on all issues, but the United States Attorney did acknowledge that Relators claims continued to narrow under scrutiny—all due to the cost and efforts of the government (taxpayers) and Defendants with no expense to Relator[5]. The government also acknowledged that there was no finding of misuse of funds, despite Relator's numerous allegations.

Defendants responded to Exhibit B on January 8, 2024, a true and correct copy of which is attached as Exhibit C. Defendants therein described two significant flaws with Relator's theory. First, that forgiveness of owner payments was to be capped at a maximum of $20,833 per individual across all businesses created a loss to the government. Unfortunately for Defendants, through an administrative error, they included owner draws in the forgiveness application attachments, which superficially gave the appearance Defendants received more in forgiveness than they should. However, and vitally, Defendants had a surplus of payroll costs in the amount of $591,638.50.  Even if the owner draws were excluded from the forgiveness application, the amount of forgiveness would have been unaffected.

Said otherwise, the owner draws included on the forgiveness application had zero impact on the amount of forgiveness provided to the Defendant companies. This was a technical foul, at best. Indeed, if Defendants could have amended their applications to eliminate the owner payments, the result would be the same. See, Exhibit C, pgs. 2-3. This fact pattern is illustrated in the following chart:

---

5 Defendants feel obligated to acknowledge the United States Attorney's office, and in particular, AUSA Adam Fischer for consistently being cordial, professional, and diligent. The Defendants are grateful to Mr. Fischer for the manner in which he handled this case.

| Payroll Cost (App 1 and 2) | $1,378,783.03 + $1,235,097.97 = $2,613,881 |
| --- | --- |
| Forgiveness (App 1 and 2) | $991,800 + $1,030,442.50 = $2,022,242.5 |
| Surplus: | $2,613,881 - $2,022,242.5 = $591,638.5 |

The second issue raised by the government related to the allegation that two of the individual defendants "pocketed" excess funds as a result of the PPP forgiveness. However, the Defendants were able to demonstrate that distributions were due to increased company revenues unrelated to the PPP funds. See, Exhibit C, pg. 4.

To the United States Attorney's credit, the demand was again reduced and the parties settled.  What started as a multi-million dollar demand based upon the careless misdirection of Relator, resulted in a $200,000 payment based solely on an administrative error that included owner draws on a forgiveness application—an error to which the Defendants objected and demonstrated zero harm to the government. Defendants made it clear that the settlement had nothing to do with any loss to the taxpayers, but instead represented costs of defense. It was Defendants' understanding that the $200,000 was the lowest number the government would agree to due to the substantial investment of time evaluating Relator's claims.

Said simply, due to a disgruntled former controller's attempt to air grievances and avenge a firing due to his own incompetence, Relator's counsel took the bait, took up a claim that

probably never should have been brought, "billed" literally hundreds of hours into a contingent file, and now expects both this Court and Defendants to sort it out and pay without scrutiny. The parties who bore the greatest burden and time in this matter were the government (paid for by taxpayers) and the Defendants, not Relator or his counsel. Relator received a small reward and any fees, to the extent awarded by this Honorable Court, should be proportional to the "success."

## **RELATOR'S FEES**

A review of the billing breakdown provided by Stone and The Employment Law Group (TELG) [ECF No. 36-1 and 36-2] shows excessive billing. Defendants object to the petition as a whole, and in particular to the number of hours and hourly rates charged. For example:

- **Wellness check:** Relator is attempting to charge Defendants because he was non-responsive to counsel. Relator's counsel billed time across three timekeepers to apparently locate Relator. Entries described emailing with law clerk, client, and private investigator firm about a wellness check on the client; database searches for telephone numbers related to client; and responding to emails related to wellness check on client. Defendants should not be charged for these amounts.

- **Administrative tasks:** Relator billed 29.9 hours across multiple law clerks and attorneys, for a total of $9,482.50 related to administrative tasks that should not be charged to Defendants. Most of these entries came from law clerks or associates. Entries describe tasks such as emailing or calling other attorneys to calendar dates for meetings and entering those meetings into a schedule; reading and filing emails; downloading documents and circulating them; and preparing and circulating meeting agendas. There also were charges for finding out what a "praecipe for summons" and for reviewing and filing emails. There also are numerous charges for "case transition," which Defendants

have no idea or context what that means. See, for example, ECF No. 36-1, lines 217-221. These charges should be eliminated entirely.

- **Multiple attorneys on same task:** Billed a total of 46.2 hours across several attorneys, law clerks, and a private investigator, for a total of $26,405.00. Entries, which were almost always identical across billers, described phone calls or meetings when two or more billers were present.  These charges are duplicative and should be reduced to 1/3, at the very least.

- **Drafting complaint:** Relator's counsel billed a total of 35 hours across one law clerk and one attorney (Stone) for a total of $10,302.50. Nearly all of the entries, except for two, were made by a TELG law clerk and describe conducting legal research in support of the complaint, drafting the complaint, and revising the complaint. The remaining two (totaling 2.7 hours and a total $2,227.50) were made by Andrew Stone and describe reviewing, revising, preparing, and filing the complaint. The complaint contains 35 paragraphs of legal boilerplate. Nine paragraphs relate to the second PPP draw, which should not be at issue in this case because it post-dates Relator's termination and he cannot therefore be the original source. As noted above, nearly all of the rest of the complaint, other than describing the parties, fell flat upon scrutiny.

- **Drafting fee petition:** Relator's counsel billed a total of 12.8 hours across one law clerk and one attorney (Woodfield) for a total of $9,000.00. The law clerk's entries total 1.2 hours ($300.00) and describe conducting research related to the fee petition and drafting an agenda for a call about the fee petition. The remaining entries describe drafting a motion, corresponding order, and memorandum in support of the fee petition.

The following individuals are listed as billers on the breakdown provided, in descending order of amount billed.

| Name (Biller) | Amount Billed | Rate/hr. | Firm |
|---|---|---|---|
| Janel Quinn | $28,145.00 | $650 | The Employment Law Group |
| Rosamond Kopzynski | $24,500.00 | $250 | The Employment Law Group |
| Nick Woodfield | $13,875.00 | $750 | The Employment Law Group |
| Andrew Stone | $12,292.00 | $825 | Stone Law Firm (local counsel) |
| Scott Oswald | $11,985.00 | $850 | The Employment Law Group |
| Anthony Primelo | $7,400.00 | $250 | The Employment Law Group |
| Cole Wilson | $7,175.00 | $250 | The Employment Law Group |
| Phil Becnel | $4,950.00 | $250 | Dinolt, Becnel & Wells (private investigator) |
| Lydia Pappas | $4,590.00 | $450 | The Employment Law Group |
| Ellenor Whitfield | $1,575.00 | $250 | The Employment Law Group |

Based on the descriptions provided in the billing breakdown, all of the document research and drafting was conducted by The Employment Law Group. For example, research and drafting related to the Complaint alone totaled nearly $10,000.00 and was handled primarily by Rosamond Kopzynski. All of the work related to drafting the fee petition and supporting documents (with the exception of 1.2 hours of research and administrative work) was handled by Nick Woodfield, totaling 11.6 hours, and $8,700.00.

Stone billed a total of 14.9 hours, and that work primarily included reviewing and revising documents drafted by The Employment Law Group and taking phone calls or teleconference meetings.

According to the costs submission [ECF No. 36-2], Relator wants to charge Defendants for what appears to be a credit report on Relator, generic "online legal research," and "database searches," and $823.10 for bates labeling documents (which can be done for free through any .pdf program)[6]. None of these costs should be passed on to Defendants except the filing fee.

---

6 There also are charges to locate an Allan Pletcher, an employee of Defendants to follow up on a claim that there was misuse of funds to perform labor on the personal residence of one of the individual defendants. Relator or the United States Attorney called this person, found there was no factual basis to Relator's claims at all, and

Outside of the $10,302.50 for drafting the complaint and $9,000 for the fee petition, approximately $90,000 is being attributed to fees allegedly incurred to bring this case. There is no distinction between the fees spent on the retaliation claim, which should not be part of this petition, or any explanation by Relator how these costs are not duplicative or excessive.

For just a few examples, Relator is attempting to charge defendants for an aborted client call [ECF No. 36-1, line 376], waiting on hold for a call with the client and co-counsel that apparently didn't occur, [ECF No. 36-1, line 378], "weekly check ins" [ECF No. 36-1, line 152], following up "again" with client [ECF No. 36-1, line 173], conducting prep and "mock interviews" [ECF No. 36-1, lines 280-289], charging fees to download and create a Microsoft Teams account [ECF No. 36-1, line 287], having four people attend Relator's interview with the United States Attorney, [ECF No. 36-1, lines 290, 293, 294], transition meetings due to counsel taking a leave of absence [ECF No. 36-1, line 376] 332-336], and numerous other calls to schedule calls and meetings to schedule other meetings.

Even a cursory review of ECF 36-1 demonstrates a feeding frenzy of billing above and beyond what was described above. The billings are simply excessive, unreasonable, and should not be passed on to Defendants under the circumstances of this case.

### A BREAKDOWN OF THE COMPLAINT

The complaint contains 152 paragraphs that are broken down as follows:

| | |
|---|---|
| 1-4 | Introduction |
| 4-7 | Jurisdiction and venue |
| 8-42 | Names and roles of parties |
| 43-78 | Legal boilerplate and standards |
| 79-105 | Allegations regarding first draw |
| 106-115 | Allegations regarding second draw |
| 116-152 | Counts, including boilerplate |

---

discontinued the line of inquiry. See, ECF No. 36-1, entries 367, 368. This is just one example of many of the wasteful efforts caused by Relator's misguided claims.

A majority of the complaint is based upon restating the law, which can be cut and pasted from Westlaw or even the Internet. Further, paragraph 106 through 115 pertain to the second draw, which relates to facts that occurred <u>after</u> Relator was fired. Again, despite Relator's allegation to the contrary in Paragraph 7 of the Complaint, he was not the original source of the allegations. The Complaint also makes allegations related to employment retaliation, which was settled separately from the matters related to this fee petition.

The Complaint was the end of the "litigation." The remaining effort on this case was spent on settlement, which was conducted primarily between the United States Attorney and Defendants. There were no depositions, no discovery from Relator, or any other court proceedings other than finalizing the settlement and seeking numerous extensions of time to keep the case under seal. Also, the boilerplate could have been taken from other work exemplars.

## <u>LEGAL STANDARD FOR AWARDING ATTORNEY FEES</u>

The False Claims Act provides that a successful relator "shall ... receive reasonable attorneys' fees and costs." 31 U.S.C. § 3730 (d)(2). "Fees are presumed reasonable when calculated using the 'lodestar' method, by which a court assigns a reasonable hourly rate and multiplies that rate by a reasonable number of hours on the litigation." <u>Simring v. Rutgers</u>, 634 Fed.Appx. 853, 857 (3d Cir. 2015).

Relator bears the burden of establishing the reasonableness of the rate(s) claimed and the hours allegedly logged and claimed. <u>Loughner v. Univ. of Pittsburgh</u>, 260 F.3d 173, 178-80 (3d Cir. 2001). <u>United States ex rel. Palmer v. C & D Techs., Inc.</u>, No. CV 12-907, 2017 WL 1477123, at *3 (E.D. Pa. Apr. 25, 2017), <u>aff'd in part, vacated in part, remanded sub nom.</u> <u>United States ex rel. Palmer v. C&D Techs., Inc.</u>, 897 F.3d 128 (3d Cir. 2018).

District courts have "substantial discretion to determine what constitutes reasonable attorneys' fees" in a *qui tam* action. United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co., 5 F.4th 315, 354 (3d Cir. 2021) (citing Palmer at 137 (3d Cir. 2018)).

Notably, to determine the lodestar, Courts generally multiply the reasonable hourly market rate by the number of hours reasonably spent. In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F.Supp. 445, 458 (E.D.Pa.1995). This does not necessarily end the inquiry. "There remain other considerations that may lead the district court to adjust the fee upward or downward." Plumbers Union Local No. 690, 2009 WL 2603162 (E.D. Pa. 2009) at *2 (quoting UAW Local 259 Soc. Sec. Dep't. v. Metro Auto Center, 501 F.3d 283, 292 (3d. Cir. 2007). For example, the lodestar may be reduced to account for "results obtained." Hensley v. Eckerhart, 461 U.S. 424, 434–36 (1983).

The Hensley Court noted that, "The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." Cases may be overstaffed, and the skill and experience of lawyers vary widely. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." Copeland v. Marshall, 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980).

The Hensley Court went on:

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049 (CD Cal.1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
***
Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. See Davis v. County of Los Angeles, 8 E.P.D. ¶ 9444, at 5049 (CD Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

Hensley has been instructive in several cases within this Circuit, including the Fairfield and Palmer cases cited supra. See also Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 318-19 (3d Cir. 2006) (recognizing district court's discretion to award reasonable attorney's fees, including reducing those fees downward in light of limited success, and upholding reduction to fee award when plaintiff prevailed on one claim, did not benefit in any tangible way from the litigation, and received an actual damages award far below her projected total damages).

Palmer, is particularly instructive. In that case, the relator alleged shipment of defective batteries that were to be used on ICBM missile launch controls. A criminal investigation ensued and the investigation closed without any action. The original demand was $30,000,000, and it settled for $1.7 million. Because the case settled, the relator was technically a "prevailing party." Palmer at *2 (E.D. Pa. Apr. 25, 2017). The same would likely hold true in this case.

The <u>Palmer</u> Court performed a standard lodestar analysis, which was then informed by reducing unnecessary and excessive fees. The Court then considered the "success" or "benefits achieved" factors, as the <u>Hensley</u> Court stated that the "degree of success obtained" is the "most critical factor" in deciding whether to adjust a fee award. <u>Hensley</u>, 461 U.S. at 424, 436.

Judge Pratter in <u>Palmer</u>, applied the above analysis and reduced the fee award from relator's fee demand of $3,113,530.50 to $1,794,427.25, or 42.4 percent of the request.

Judge Pratter also noted the results of the relator's claim was "modest." There was no remediation requirement, e.g., requiring the defendant to change business practices, and the government continued to do business with the defendant. She astutely noted, "The major benefit to the resolution of the case seems to be just that: it is concluded at last, without mounting more fees and costs and time intrusions." <u>Palmer</u> at 10.

The present case is similar in context. The government noted that Defendants properly used the PPP funds, and even complimented Defendants on benefitting the Community. (Ex. B). There is no "remedial" nature of this dispute, as the PPP funding and forgiveness were unique and limited to discreet transactions that will not repeat. After years of investigation and burden to the government, a $200,000 settlement occurred, of which $94,821.82 was paid as restitution. Relator received $32,000. There was no discovery in this case other than the government's document requests and a subpoena by the government to the lenders.

Defendants fully cooperated with the government. Defendants did not subject the government or relator to wasteful litigation or discovery. In the end, nearly all of Relator's claims failed under the most basic scrutiny, which is stunning considering he was the controller and should have known the validity of his claims before starting this expensive and wasteful process.

16

As the <u>Hensley</u> Court said, the most critical factor here is the degree of success obtained. Relator had minimal success, he should have known better before making his claims, and counsel should have identified the weakness in this case much earlier. Chasing borderline frivolous claims is akin to bringing an unrelated claim for which no fees should be awarded. Certainly, Defendants should not have to pay for this fishing expedition.

Therefore, it is requested that Relator's fees be significantly reduced, and certainly no more than the $32,000 award granted to Relator. Based on the facts here, this Honorable Court has discretion to go even lower. See, <u>U.S. ex rel. Singh v. Bradford Regl. Med. Ctr.</u>, No. CIV. 04-186, 2013 WL 5467107 at *2, 4 (W.D. Pa. Sept. 30, 2013)(A fee award that is about 21% of the settlement amount is reasonable, even in light of defendant's argument that the fee should be reduced further because it is in bankruptcy.)

<u>**THE DECLARATION OF GARY HUNT, ESQ.**</u>

Defendants submit the declaration of Gary Hunt, Esq. in support of this objection and response, which is attached hereto as Exhibit D.

Mr. Hunt is a noted complex commercial attorney who has been practicing in this District for 48 years. His career is exemplary and among other accolades and positions, he was Managing Shareholder of Tucker, Arensberg, P.C. and is familiar with hourly rates charged in this District. His qualifications appear in paragraphs 1 through 11 of Exhibit D.

Mr. Hunt notes that *qui tam* cases are not inherently complicated. Ex. D, ¶ 14. The processes and procedures are straightforward. Ex. D, ¶ 15. PPP claims are not novel. Ex. D, ¶ 16. Therefore, whether fees are reasonable depends on the complexity of the case and a variety of related factors. Ex. D, ¶ 18.

Mr. Hunt acknowledges the potential risk for counsel when pursuing *qui tam* cases on a contingency. Ex. D, ¶ 20. However, the "disconnect" between an amount of recovery and the fees claimed can result in unreasonable fee claims. Ex. D, ¶ 22.

After review of the case materials, Mr. Hunt opines that the fees sought here are unreasonable. Ex. D, ¶ 25. He noted that: (a) the claim was made more complex than required; (b) the rates were unreasonably high; (c) Relator (who lives in or near Somerset, Pa., hired Washington, D.C. counsel); (d) the rates charged by local counsel was excessive (despite being an excellent lawyer); and € the litigation was not complex. Ex. D, ¶¶ 25-27. He also questions the number of hours billed, which he believes to be excessive in scope, type, and amount. Ex. D, ¶ 29.

Based upon his review of the case, the settlement achieved, the rates charged, and the number of hours billed, his opinion is that a reasonable fee would be between $50,000 to a maximum of $70,000. Ex. D, ¶ 31. He also notes it would not be unreasonable for this Court to award an even lower amount considering the circumstances of this case. Ex. D, ¶ 22.

Relator did not file a similar affidavit, other than the general one provided by Attorney Morgan referenced above.

## **CONCLUSION**

Kane received his *qui tam* reward, which essentially was a severance to which he was not entitled. As the controller who apparently took company information with him upon his firing, he should have been able to deliver a neat package to his lawyers that resulted in great success— unless of course he was wrong. He was with one administrative exception. There is a reason why the government's last demand of $382,802 (Ex. B) was reduced by almost half.

18

Despite Kane's misdirection, his attorneys spent countless hours billing every second on every evolution that touched this case in the hope that a blank check would come. As noted above, this included administrative costs, downloading and installing software, time spent <u>finding</u> their own client, and having multiple attorneys on matters that—under a normal client relationship—would not be charged to a client.

The rates sought by Relator are excessive. From local counsel to the Washington, D.C. firm Kane selected, the rates are several hundred dollars per hour more than what is normal in the community, as Attorney Hunt noted.

The fees requested are disproportionate to the results achieved. This case did not require $116,000 in fees. To seek that amount on a settlement of $200,000 is excessive. Arguably, the fees should not exceed the reward of $32,000. This Court has discretion to modify the award to meet the specifics of the case.

Finally, Defendants respectfully request this Honorable Court to consider the fact that Kane sent the government on a path to conduct discovery, research, and legal work based upon allegations he made that simply were not true. In the end, there was no misuse of funds. No employees were paid with gift cards to hide malfeasance. The employee count was not too high, which would have disqualified Defendants from the PPP benefits. It is a technicality without damages, a harm not felt, and an allegation without merit.

Defendants appreciate and respect the purpose of the *qui tam* process. The public treasury must be guarded. However, in this case, the real loss to the government, and the taxpayers, was wasting time chasing Relator's theories. Neither he nor his counsel should be rewarded.

Respectively submitted,

SPILMAN THOMAS & BATTLE, PLLC

By: /s/ Julian E. Neiser
    Julian E. Neiser
    Pa. Id. No. 87306

    One Oxford Centre, Suite 3440
    301 Grant Street
    Pittsburgh, PA  15219

    T:  (412) 325-1116
    F:  (412) 325-3324
    E:  jneiser@spilmanlaw.com

**Attorneys for Defendants Beeghly Tree, LLC, Hillvale Enterprises, LLC, ProGro Environmental, LLC, Hillvale Farms, Ryan Beeghly, Matt Beeghly, and Heath Younkin**

**IN THE UNITED STATES DISTRICTCOURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
Johnstown Division

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. MIKE KANE, | CIVIL DIVISION |
| Plaintiff/Relator, | No. 21-cv-160 |
| v. | Hon. Kim R. Gibson |
| BEEGHLY TREE, LLC, HILLVALE ENTERPRISES, LLC, PROGRO ENVIRONMENTAL, LLC, HILLVALE FARMS, RYAN BEEGHLY, MATT BEEGHLY, and HEATH YOUNKIN, | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that **Defendants' Response in Opposition to Relator's Motion for an Award of Attorneys Fees and Expenses** was served upon counsel of record this 7th day of November, 2024 to the following:

Via email to astone@stone-law-firm.com

Andrew M. Stone, Esquire
Stone Law Firm, LLC
437 Grant Street, Suite 1806
Pittsburgh, PA 15219

**Counsel for Relator Mike Kane**

Via email to
soswald@employmentlawgroup.com and
jquinn@employmentlawgroup.com

R. Scott Oswald, Esquire
Janel Quinn, Esquire, *pro hac vice*
The Employment Law Group, P.C.
1717K St., NW, Suite 1110
Washington, DC 20006

**Counsel for Relator Mike Kane**

SPILMAN THOMAS & BATTLE, PLLC

By:/s/ Julian E. Neiser